**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CANTON DROP FORGE, INC., | ) | CASE NO.  5:18-cv-01253 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| | ) | |
| TRAVELERS CASUALTY & | ) | |
| SURETY COMPANY, *formerly known* | ) | MEMORANDUM OPINION AND |
| *as* Aetna Casualty and Surety Company, | ) | ORDER |
| | ) | |
| DEFENDANT. | ) | |

### I.      Introduction

Plaintiff Canton Drop Forge, Inc. (also referred to herein as "Plaintiff" or "CDF"), a company that utilizes its property for forging manufacturing operations, filed this action against Defendant Travelers Casualty & Surety Company, *formerly known as* Aetna Casualty and Surety Company (also referred to herein as "Defendant" or "Travelers"), seeking insurance coverage under one or more primary or umbrella policies[1] alleged to have been issued to CDF between 1945 and 1982 (also referred to herein as the "policies").

"Commencing in or around 1942, CDF operated an engineered wastewater recycling and disposal system, which included retention basins, known as Ponds."  Doc. 1, p. 3, ¶ 13.[2]  "The manufacturing process wastewater contains oil, water (condensed steam), and cooling water, plus

---

[1] The parties also refer to the umbrella policies as excess or excess umbrella policies.  *See e.g.*, Doc. 54-1, pp. 20; Doc. 55, pp. 6, 7; Doc. 60, pp. 7, 8.

[2] Page number citations correlate to the ECF Doc. page numbers.

surface water.  Prior to 2016, the process wastewater flowed by gravity from catch basins in the vicinity of furnaces and hammers within the forge building to a sub-grade grit chamber and oil-water separator located immediately south of the facility's main forge and furnace shop. Oil captured by the oil-water separator was collected for recycling and effluent from the oil-water separator was discharged to the retention basins, known as Ponds."  Doc. 1, p. 3, ¶ 14; Doc. 60-1, p. 2, ¶¶ 3-4.  "The CDF wastewater recycling and disposal system, including the Ponds, was designed to capture process water and surface water and contain any potential pollutants."  Doc. 1, p. 3, ¶ 15; Doc. 60-1, p. 2, ¶ 4.

"On January 22, 2013, the United States Environmental Protection Agency ("US EPA") issued a Notice of Violation to CDF related to the accumulation of oil within the Ponds (the "CDF Pond Closure Claim")."  Doc. 1, p. 4, ¶ 16; *see also* Doc. 55, p. 4, ¶ 25.  "On September 18, 2014, US EPA and CDF entered a Consent Agreement and Final Order ("CAFO") to resolve the CDF Pond Closure Claim."  Doc. 1, p. 5, ¶ 23.  Pursuant to the CAFO, a civil penalty of $431,100.00 was assessed against CDF to settle the action.  Doc. 1, p. 5, ¶ 24; *see also* Doc. 55-50, p. 6, ¶ 36.  Also, CDF was required to "submit and implement a closure plan for the Ponds through Ohio Environmental Protection Agency ("Ohio EPA") (the "CDF Pond Closure Project")."  Doc. 1, p. 5, ¶ 25; *see also* Doc. 55-30, pp. 8-10, ¶¶ 41-49.  "On August 9, 2016, Ohio EPA issued a final closure letter to CDF[.]"  Doc. 1, p. 5, ¶ 28; *see also* Doc. 55, p. 4, ¶ 32.  "By letter dated November 30, 2016, CDF first notified Travelers of its claim."  Doc. 55, p. 5, ¶ 35.

CDF seeks a declaratory judgment that Travelers[3] is obligated to indemnify CDF under one or more insurance policies issued to Canton Drop Forging and Manufacturing Co. for at least $5,000,000.00[4] in past and future losses resulting from the Pond Closure Claim.  Doc. 1. CDF also alleges that, by failing to indemnify CDF, Travelers breached its contractual obligations under one or more insurance policies.  *Id.*  Defendant has filed a Motion for Summary Judgment ("Motion") seeking dismissal of this action with prejudice. Doc. 54, Doc. 54-1. The Motion has been fully briefed.[5]

As discussed below, Travelers is not seeking summary judgment on the grounds that the policies do not exist[6] and for purposes of its Motion does not contest the existence of at least five umbrella policies.   Doc. 54-1, p. 6, n. 2; Doc. 54-1, p. 20.   Thus, in considering the pending Motion, the Court assumes without deciding that one or more policies of insurance was

---

[3] Plaintiff alleges that the Aetna Casualty and Surety Company ("Aetna"), which merged into Travelers in 1997, and the Standard Fire Insurance Company ("Standard Fire"), which is a subsidiary of Travelers, issued liability insurance policies to CDF.  Doc. 1, p. 2, ¶¶5-6.

[4] As discussed below, the actual amount of damages that CDF claims is approximately $8.1 million.  Doc. 55, p. 5, ¶ 38.

[5] Plaintiff filed an Opposition (Doc. 60) and Defendant filed a Reply (Doc. 62).

[6] Travelers asserts, however, that it "fully reserves its right to challenge as a matter of law and/or fact the existence of these policies, and further reserves its right to put CDF to its proofs at trial as to the purported existence of each of the 43 policies CDF claims exist[.]"  Doc. 54-1, p. 6, n. 2.   As explained by the Ohio Supreme Court,

> It is undisputed that one seeking to recover on an insurance policy generally has the burden of proving a loss and demonstrating coverage under the policy." **839 Inland Rivers Serv. Corp. v. Hartford Fire Ins. Co. (1981), 66 Ohio St.2d 32, 34, 20 O.O.3d 20, 418 N.E.2d 1381. Thus, an insured seeking benefits must prove the existence of a policy covering the relevant period. 17 Russ & Segalla, Couch on Insurance (3d Ed.2003), Section 254:11. When the document of insurance has been lost or destroyed, the existence of coverage may be proved by evidence other than the policy itself when the loss or destruction was not occasioned by bad faith on the part of the proponent of the document. Evid.R. 1004. "The coverage provided by destroyed or lost policies can be proven through use of circumstantial evidence (i.e. payment records, renewal letters, miscellaneous correspondence, or prior claims files)." 14 Couch, supra, Section 208:30.  We hold that when an insurance policy is missing, lost, or destroyed, its terms may be proved by secondary evidence, unless the record contains evidence that the policy was lost or destroyed in bad faith.

*Sharonville v. Am. Employers Ins. Co.*, 109 Ohio St. 3d 186, 191, 846 N.E.2d 833, 838–39 (2006).

issued by Defendant to CDF.[7]  *See e.g.*, *Wiseman Oil Co., Inc. v. TIG Insurance Co.*, 2013 WL 264370, * 1, n. 1, * 4, & * 15 (W.D.Pa. Jan. 22, 2013), *report and recommendation adopted*, 2013 WL 1149953 (W.D. Pa. Mar. 19, 2013) (when rendering a decision on summary judgment motions, the court reserved making a legal determination as to the existence of the policies where the insurer argued in part that, even presuming the issuance of insurance policies as alleged by the plaintiff, plaintiff could not prevail).  Furthermore, the Court has considered the Motion in light of the parties' Joint Stipulation, including their stipulation regarding relevant language that would be contained in policies "[t]o the extent that CDF is able to establish the existence and terms of primary or excess policies issued by Aetna for which coverage exists[.]"  Doc. 55, pp. 5-8, ¶ 39.

For the reasons explained more fully below, assuming arguendo the existence of one or more policies of insurance, the Court determines that Travelers is entitled to summary judgment because CDF, in breach of the policy terms the parties have stipulated to, failed to provide reasonable notice of its Pond Closure Claim to Travelers as a matter of law and Travelers was prejudiced by that breach.  In addition, CDF settled the Pond Closure Claim without the consent of Travelers, also in breach of the policy terms.  Thus, the Court concludes that Travelers is

---

[7] Travelers has located partial copies of five umbrella policies, identified as follows: 02 XS 802341 WCA (4/24/1975-1/1/1976); 02 XS 802341 WCA (1/1/1976-1/1/1977); 02 XS 4325 WCA (1/1/1979-1/1/1980); 02 XS 4811 WCA (1/1/1980-1/1/1981); 02 XS 61690 WCA (1/1/1981-1/1/1982).  Doc. 54-1, p. 20, n. 57 (citing (Doc. 54-2 (Trav. Ex. A, Harris Aff. ¶ 3, Exs. A1-A5)).  In its Complaint, CDF alleges that Aetna issued the following policies to CDF: General Liability ("GL"), 2 PP 16470 (1945); GL, 2 AL 2116 (12/22/1952-12/22/1953); GL, 02 AL 205086 CMA (01/01/1973-01/01/1974); Umbrella, RDU 9753104 (04/24/1972-04/24/1975); Comprehensive General Liability ("CGL"), 02 AL 802341 CMA (01/01/1975-01/01/1976); Umbrella, 02 XS 802341 WCA (4/24/1975-01/01/1976); CGL, 02 AL 802341 CMA (01/01/1976-01/01/1977); Umbrella, 02 XS 802341 WCA (01/01/1976-01/01/1977); CGL, 02 GL 15014 CCA (01/01/1979-01/01/1980); Umbrella, 02 XS 4326 WCA (01/01/1979-01/01/1980); CGL, 02 GL 54294 CCA (01/01/1980-01/01/1980); Umbrella, 02 XS 4811 WCA (01/01/1980-01/01/1981); and Umbrella, 02 XS 61690 WCA (01/01/1981-01/01/1982).  Doc. 1, pp. 5-6, ¶ 31.  Plaintiff also alleges in its Complaint that "CDF has identified the following Comprehensive General Liability Policy that Standard Fire issued to CDF: number 02 GL 58420 CCS, effective 01/01/1981-01/01/1982[.]"  Doc. 1, p. 6, ¶ 32.

entitled to judgment as a matter of law and **GRANTS** Defendant's Motion for Summary

Judgment and dismisses with prejudice Plaintiff's claims.

## II.     Underlying Facts and Background

In connection with the pending Motion, the parties filed a joint stipulation of

uncontested facts, including exhibits that the parties have agreed to stipulate to and submit

jointly.  Doc. 55.  The joint exhibits are labeled and referred to as "JS Ex."[8]  Doc. 55, p. 1, n. 1.

### A.  History and Background

"CDF was founded in 1903 as The Canton Drop Forging and Manufacturing Company,

which name was changed to 'Canton Drop Forge, Inc.' in the late 1980s."[9]  Doc. 1, p. 3, ¶ 10.

"The CDF facility currently services aerospace, oilfield industry, power generation, mechanical

power transmission, off-highway and railways.  Primary operations conducted at the Site

include receiving raw material; saw-cutting, forging, and heat treatment capabilities; and

inspecting, die design, and shipping finished products."  Doc. 1, p. 3, ¶ 12.

"The Canton Drop Forge property is used for forging manufacturing operations and is

located on Southway Road in Canton, Ohio (the "Site"). There are three 'ponds' or 'lagoons' on

the Site that have been there since the early 1940's. The purpose of these ponds or lagoons is to

collect and manage process water and surface water. (JS Ex. 1)."  Doc. 55, p. 1, ¶ 1; *see also*

Doc. 60-1, p. 1, ¶ 4.  The ponds were also designed to recycle oil.  Doc. 60-1, p. 1, ¶ 4.

"On June 6, 1967, National Inspection Co. inspected the Site and prepared a Report (JS

Ex. 39)."  Doc. 55, p. 8, ¶ 40.  "On May 24, 1972, Insurance Services Office of Ohio inspected

---

[8] The Joint Exhibits are filed as Docs. 55-1 through 55-52.

[9] "CDF originally operated in Canton from a small building with two forging hammers. By 1909, CDF added four forging hammers and moved operations to a larger facility, known as Plant A. In 1942, CDF operated a United States Department of Defense facility known as Plant B, which CDF purchased in 1951. By the mid-1980s, Plant A was shut down and Plant B was the sole operating facility."  Doc. 1, p. 3, ¶ 11.

the Site and prepared a Report. (JS Ex. 40)." *Id.*, p. 8, ¶ 41.  "On November 7, 1977, Aetna

prepared a Products Liability Report. (JS Ex. 41)." *Id.*, p. 8, ¶ 42.  "On June 20, 1978, CDF

submitted to Ohio Environmental Protection Agency ("OEPA") an Operational Report Solid

Waste Disposal Site prepared by The Mogul Corporation (the "Mogul Operational Report"). (JS

Ex. 2)." *Id.*, p. 1, ¶ 2.  "On December 8, 1978, CDF received a letter from OEPA requesting

additional details on items referenced in the Mogul Operational Report. (JS Ex. 3)." *Id.*, p. 1, ¶

3.  "On January 3, 1979, CDF replied to OEPA's request for additional information. CDF and

OEPA corresponded through 1981 regarding the Mogul Operational Report. On October 16, 1981,

OEPA issued Director's Final Findings and Orders. (JS Ex. 4)." *Id.*, p. 2, ¶ 4.

"On March 20, 1979, Aetna visited the Site and prepared a report. (JS Ex. 42)."  Doc. 55, p.

8, ¶ 43.  "Aetna prepared a Special Report based upon a December 1, 1981 survey. (JS Ex. 43)."

*Id.*, p. 8, ¶ 44.  "In 1983, OEPA inspected the Site and issued a letter to CDF. CDF responded to

OEPA's letter. (JS Ex. 5)." *Id*, p. 2, ¶ 5.

"On July 25, 1988, through counsel, CDF provided notice of potential liability from USEPA

in connection with the Summit National Facility in Deerfield, Ohio (the "1988 Summit National

Claim") to its insurers, including Aetna Casualty and Surety Company ("Aetna"). (JS Ex. 44)."

Doc. 55, p. 8, ¶ 45.  "On September 18, 1989 and on September 21, 1989, counsel for CDF

communicated settlement demands in the 1988 Summit National Claim to all insurance companies,

including Aetna. (JS Exs. 45 and 46)." *Id.*, p. 8, ¶ 46.  "On September 26, 1989, Aetna sent a letter

to CDF acknowledging receipt of the 1988 Summit National Claim. (JS Ex. 47)." *Id.*, p. 8, ¶ 47.

"On October 5, 1989, Aetna sent a letter requesting information. (JS Ex. 48)." *Id.*, p. 8, ¶ 48.  "On

February 14, 1990, Aetna sent a follow-up letter. (JS Ex. 49)." *Id.*, p. 9, ¶ 49.  "By way of letter

dated November 16, 1994, Aetna denied coverage for the 1988 Summit National Claim. (JS Ex.

50)." *Id.*, p. 9, ¶ 50.

"In 1991, and again in 1992, the U.S. Environmental Protection Agency's ("EPA")

consultants performed inspections of the Site and issued reports. (JS Exs. 6 and 7)." Doc. 55, p.

2, ¶ 6. "In 1993, CDF engaged Hammontree & Associates ("Hammontree") to conduct a

Preliminary Soil and Groundwater Assessment of the Site. Hammontree made several

recommendations. (JS Ex. 8)." *Id.*, p. 2, ¶ 7. "CDF prepared an internal "Audit Action Plan"

dated March 31, 1993. (JS Ex. 9)." *Id.*, p. 2, ¶ 8.

"CDF prepared regular status updates on the Audit Action Plan through 1997." Doc. 55,

p. 2, ¶ 9. "In 1995, Hammontree prepared another report regarding "Lagoon #2 Sludge

Disposal/Treatment Options." (JS Ex. 10)." *Id.*, p. 2, ¶ 10. "In 1995, Pond 1 was drained and

the bottom material was excavated for bioremediation. (JS Exs. 11 and 12)." *Id.*, p. 2, ¶ 11. "In

1995, CDF installed an oil/water separator ("OWS"). The OWS did not work properly and

process water containing oil continued to be discharged into the ponds until approximately

2016." *Id.*, p. 2, ¶ 12.

"In May 1997, Parsons Engineering Science ("Parsons") prepared a report, Lagoon #1

Re-Construction/Biocell Disposal Summary Report of Feasibility Analysis. (JS Ex. 13)." Doc.

55, p. 2, ¶ 13.

"On September 8, 1997, Parsons sent a Summary Report of the Results of

Environmental and Geotechnical Sampling, Analyses and Treatability Testing of Lagoon No. 3

Depositional Material at Canton Drop Forge, Inc. to CDF. (JS Ex. 14)." Doc. 55, p. 3, ¶ 14. "In

an internal CDF memo regarding Current Status Audit Action Plan, dated November 24, 1997,

J.P. Bressanelli stated that "According to Parsons, current EPA regulations require us to stop the

discharge of oil bearing waste streams to lagoons, but do not require remediation of oil

impacted soil on the bottom or around the lagoon banks." (JS Ex. 15)." *Id.*, p. 3, ¶ 15. "A

December 29, 1997 CDF internal document identified various environmental issues at the Site. (JS Ex. 16)." *Id.*, p. 3, ¶ 16.

"In September 2000, Hammontree prepared an Environmental Site Assessment that made several recommendations. (JS Ex. 17)." Doc. 55, p. 3, ¶ 17.  "By way of letters dated February 27, 2001 and June 7, 2001, Parsons provided recommendations based upon that September 2000 Hammontree Environmental Site Assessment. (JS Exs. 18 and 19)." *Id.*, p. 3, ¶ 18.

"On July 1, 2011, USEPA performed a site screening pursuant to the Resource Conservation and Recovery Act ("RCRA"). (JS Ex. 20)."  Doc. 55, p. 3, ¶ 19.  "In the spring and summer of 2012, CDF engaged environmental consultant TRC Environmental Corp. ("TRC") to evaluate the Site for purposes of considering participation in the Ohio Voluntary Action ("VAP") program.  VAP allows eligible participants a way to investigate possible environmental contamination, clean it up if necessary, and receive a promise from the State of Ohio (via a Covenant Not to Sue) that no more cleanup is needed." *Id.*, p. 3, ¶ 20; *see also* https://epa.ohio.gov/derr/volunt/volunt (last visited 3/10/2021).

"USEPA inspected the Site on August 6-8, 2012, and issued a report of its inspection on September 11, 2012. (JS Ex. 22)."  Doc. 55, p. 4, ¶ 22.  "In September, 2012, Environ International Corp., an environmental consultant, prepared a Phase I Environmental Site Assessment. (JS Ex. 21)." *Id.*, p. 3, ¶ 21.  "On September 5, 2012, CDF, through TRC, submitted a Notice of Entry in the RCRA and Ohio VAP Memorandum of Agreement Track program.[10] (JS Ex. 23)." *Id.*, p. 4, ¶ 23.  "As part of the VAP, TRC performed the required

---

[10] "U.S. EPA and Ohio EPA have entered into a Superfund and RCRA Memorandum of Agreement for the Voluntary Action Program, called the 'MOA Track.' The MOA Track requires volunteers to follow the existing procedures for VAP sites and conduct additional steps. The MOA Track includes more agency involvement, such as notice of entry into the program, approval of certain documents and works plans, and greater public

Phase I and Phase II site assessments commencing in September 2012 and October 8, 2012, respectively. (JS Exs. 24 and 25)."[11]  *Id.*, p. 4, ¶ 24.  Also, in 2012, there were discussions regarding a potential sale of CDF.  Doc. 45, pp. 89-92, 98-100.

"On January 22, 2013, USEPA issued a Notice of Violation ("NOV") under RCRA to CDF. (JS Ex. 26)."  *Id.*, p. 4, ¶ 25.  The NOV informed CDF that "[t]he purpose of the inspection [on August 6-8, 2012,] was to evaluate CDF's compliance with certain provisions of the Resource Conservation and Recovery Act (RCRA)" and that the EPA found that CDF [was] in violation of the requirements of the Used Oil Management Standards set forth in the Ohio Administrative Code (OAC) and United States Code of Federal Regulations (CFR)."  Doc. 55-26, p. 1.

"CDF sent USEPA a February 20, 2013 letter responding to the NOV. (JS Ex. 27)."  *Id.*, p. 4, ¶ 26.  "On March 22, 2013, OEPA notified CDF that it was not eligible to participate in the VAP because of the pending NOV. (JS Ex. 28)."  *Id.*, p. 4, ¶ 27.  "From January 2013 through the summer of 2014, CDF engaged in negotiations with USEPA and OEPA to resolve the NOV and its potential liability.  In connection with those negotiations, CDF was assisted by environmental consultants and attorneys."  *Id.*, p. 4, ¶ 28.

"On September 3, 2014, OEPA issued Final Findings and Orders of the Director ["DFFO"] in connection with the NOV. (JS Ex. 29)."  *Id.*, p. 4, ¶ 29.  While captioned "Final Findings and Orders," the DFFO reflects that it was agreed to by CDF.  Doc. 55-29, p. 2 ("It is

---

involvement. Participants who conduct these additional steps have the added comfort of knowing that the cleanup is being conducted under a program that the U.S. EPA has reviewed and determined to be adequate." https://epa.ohio.gov/derr/volunt/volunt#189716676-memorandum-of-agreement-moa-track ("Program Info/Services") (last visited 3/10/2021); *see also* Doc. Doc. 60-5.

[11] As part of TRC's assessments, ground water sampling was performed and elevated levels of TCE were detected.[11]  Doc. 55-25, pp. 43-44.  TCE or "Trichloroethylene is a de[g]reasing solvent."  Doc. 46, p. 68:11-12; *see also* https://www.dictionary.com/browse/trichloroethylene (last visited 3/10/2021).

agreed by the parties hereto as follows:”); Doc. 55-29, p. 8.  “On September 18, 2014, USEPA

issued a Consent Agreement and Final Order in resolution of the NOV. (JS Ex. 30).”  *Id.*, p. 4, ¶

30.

“On June 27, 2016, CDF submitted a closure certification to OEPA for the Ponds. (JS

Ex. 31).”  *Id.*, p. 4, ¶ 31.  “On August 9, 2016, OEPA issued a ‘Final Closure’ letter to CDF on

August 9, 2016. (JS Ex. 32).”  *Id.*, p. 4, ¶ 32.

“By letter dated November 30, 2016, CDF first notified Travelers of its claim. (JS Ex.

34).”  *Id.*, p. 5, ¶ 35.  “On December 6, 2016, Travelers acknowledged receipt of CDF’s claim.

(JS Ex. 35).”  *Id.*, p. 5, ¶ 36.  “On January 9, 2017, Travelers sent email correspondence regarding

CDF’s claim. (JS Ex. 51).”  *Id.*, p. 9, ¶ 51.  “On February 1, 2017, Travelers sent CDF a letter

regarding CDF’s claim. (JS Ex. 52).”  *Id.*, p. 9, ¶ 52.  “On September 14, 2017, Travelers sent

CDF a letter regarding coverage issues. (JS Ex. 36).”  *Id.*, p. 5, ¶ 37.

“On January 31, 2018, OEPA sent a letter to CDF regarding the Revised Initial

Eligibility Determination for OEPA RCRA and VAP MOA Track. (JS Ex. 33).”  *Id.*, p. 5, ¶ 33.

As of May 1, 2020, “evaluation efforts related to TCE contamination remain[ed]

ongoing.”  *Id.*, p. 5, ¶ 34.

“CDF claims damages of approximately $8.1 million.”[12]  *Id.*, p. 5, ¶ 38.  Additionally,

CDF asserts that it continues to incur costs in order to comply with US EPA and OEPA

mandates, including groundwater investigation at the site and potential remediation.  Doc. 1, p.

5, ¶ 29; Doc. 60-1, p. 5, ¶¶ 23-26.

## B.  Insurance Policies

---

[12] “CDF has produced a summary of damages which identifies all of the specific costs at issue, setting forth the
relevant vendors, dates and an explanation of the services provided. (JS Exs. 37 and 38). [The parties have
stipulated that] [t]his summary is a true and accurate summary of the expenses for which CDF seeks recovery in
this lawsuit.”  Doc. 55, p. 5, ¶ 38.

CDF asserts claims for coverage under various primary and/or excess policies that CDF contends were issued by Aetna and/or Standard Fire between 1945 and 1982.  Doc. 1, pp. 5-8, ¶¶ 30-46; Doc. 54-1, p. 6.  Neither party has located a complete copy of any of the policies; [13] Defendant indicates that it has located partial copies of five umbrella policies issued between 1975 and 1982.   Doc. 1, p. 6, ¶ 33; Doc. 54-1, p. 6, n. 2; Doc. 54-1, p. 20, n. 57.  As noted above, Travelers is not seeking summary judgment as to the existence of the insurance policies and, for purposes of its Motion only, does not contest the existence of the five umbrella policies of which partial copies have been located.  Doc. 54-1, p. 6, n. 2; Doc. 54-1, p. 20.   Further, Travelers asserts that it is not seeking summary judgment as to the existence of the policies because, "any primary or excess policies that do exist would, as CDF's expert concedes, necessarily have contained the same pertinent policy language that makes summary judgment appropriate under the legal principles articulated in [its] Motion[.]"  Doc. 54-1, p. 6, n. 2.

The parties have stipulated that: "To the extent that CDF is able to establish the existence and terms of primary or excess policies issued by Aetna for which coverage exists, those policies would contain the following relevant language:"[14]

### The Insuring Agreements

Primary policies would contain language such as:

Coverage B – Property Damage Liability

---

[13] In its Motion, Defendant indicates that "CDF's expert has opined that Aetna *may have* issued 43 policies in total but he has not provided any actual *proof* as to the actual terms, conditions, limits and exclusions of any of those policies." Doc. 54-1, pp. 19-20 (emphasis in original).  Plaintiff's policy reconstruction expert is Douglas Talley, J.D. Doc. 54-1, p. 21, n. 59; *see also* Docs. 52 & 53.  Plaintiff, in its opposition brief, asserts that it "seeks coverage under approximately thirty primary and at least seven excess umbrella policies issued" by Aetna.  Doc. 60, p. 7

[14] Travelers asserts that it "is not waiving any issue with regard to CDF's claim as to the existence of [the] polices[.]"  Doc. 54-1, p. 6, n. 2.

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.

Umbrella policies would contain language such as:

Travelers agrees to "indemnify the insured for ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages because of…property damage…to which this policy applies…" Policies, at 2.1.

"Ultimate net loss" is defined as, "[T]he sum actually paid or payable in cash in the settlement or satisfaction of any claim or suit for which the insured is liable either by adjudication or settlement with the written consent of the company, after making proper deduction for all recoveries and salvages collectible."

### *Definitions of "Property Damage" and "Occurrence"*

"Property damage" is defined as:

(1) physical injury to or destruction of tangible property which occurs during the policy period including the loss of use thereof at any time resulting therefrom, or

(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period (Policies, at 5.12.) (Travelers MSJ Ex. _)

"Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in . . . **property damage** . . . which is neither expected nor intended from the standpoint of the **insured**." Policies, at 5.9

### *Exclusions*

Owned Property Exclusion

Primary and Umbrella Policies would contain exclusionary language such as:

"[t]his policy does not apply . . . to property damage . . . to any property rented to, used or occupied by or in the care, custody or control of the insured . . . ." Exclusion 2.2 (e)

Pollution Exclusion

Since the early 1970's,[2] the Primary and Umbrella Policies contained the following pollution exclusion:

FN 2 - The parties have not been able to stipulate to when the Pollution Exclusion existing in Aetna policies first appeared, though Plaintiff does acknowledge they existed as of 1973. However, Travelers will submit affidavit testimony providing evidence that Aetna used the Pollution exclusion as a matter of regular course by means of endorsements to its policies beginning in 1970.

This policy does not apply:

(d) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course of body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental . . . .

*Conditions*

Notice

The Umbrella Policies would contain language such as:

Notice of Occurrence: Upon the happening of any occurrence reasonably likely to involve any of the coverages of this policy, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable. Policies, at 6.3(a)

The Primary Policies would contain similar notice provisions, such as the following:

Upon the occurrence of an accident written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. ("Exemplar Policies" "effective" from 1945-1948) (Talley Report Tab 23)

In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses shall be given by or forth the insured to the company or any of its authorized agents as soon as practicable.

If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

Assistance and Cooperation

The Primary Policies would contain the following condition regarding assistance and cooperation:

> The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the accident.

Doc. 55, pp. 5-8, ¶39 (emphasis in original).

### III.    Plaintiff's Claim

CDF seeks a declaration of coverage and indemnification for all costs associated with the Pond Closure Claim, which encompasses both the costs incurred to remediate the Ponds under the Pond Closure Plan, including investigation, process wastewater design modification, oil water separator upgrades, plus removal of oil impacted soil and equipment, and restoration of the Ponds, and the costs incurred to investigate/remediate groundwater under the Ohio VAP-MOA, as mandated by the DFFO and CAFO.

Doc. 60, p. 14.

As set forth in the parties' joint stipulation, "CDF claims damages of approximately $8.1 million. CDF has produced a summary of damages which identifies all of the specific costs at issue, setting forth the relevant vendors, dates and an explanation of the services provided. (JS Exs. 37 and 38).  This summary is a true and accurate summary of the expenses for which CDF seeks recovery in this lawsuit."  Doc. 55, p. 5, ¶ 38.

Although the parties have agreed that the approximate amount of damages alleged by Plaintiff is $8.1 million, the parties disagree as to whether the Pond Closure Claim encompasses only the costs associated with closure of the ponds or whether it encompasses costs associated with closure of the ponds and costs associated with investigating and remediating groundwater under the Ohio VAP MOA.

Plaintiff asserts that the Pond Closure Claim encompasses both because the groundwater investigation was mandated by the DFFO and CAFO.  Doc. 60, pp. 12-14.

Defendant asserts that the TCE groundwater contamination issue was not targeted by the US EPA in its Notice of Violation  ("NOV"); CDF has been addressing the TCE issue as part of its voluntary commitment under the Ohio VAP to address site wide contamination issues; CDF and TRC have indicated that the TCE contamination is unrelated to the remediation and closure of the Ponds; and, in its Complaint, Plaintiff only seeks recovery for the Pond Closure Claim which is "defined as being related to the 'accumulation of oil within the Ponds'" (Doc. 54-1, p. 18, n. 53).  Doc.  54-1, p. 18.

Although Plaintiff asserts that it "continues to incur costs related to groundwater investigation at the site[,]" (Doc. 1, p. 5, ¶ 29; Doc. 60, p. 14; Doc. 60-1, p. 5, ¶ 26), the damages claimed by CDF were or are costs incurred to satisfy and comply with its obligations under the CAFO and DFFO, obligations that CDF agreed to and assumed prior to tendering its claim to Travelers in November 2016.  Thus, even if the alleged costs associated with groundwater investigation and treatment are encompassed in the Pond Closure Claim, the Court's analysis and conclusions set forth below would not change.

### IV.    Summary of Defendant's Arguments

Travelers argues that summary judgment is warranted because:  (1) CDF breached a policy condition by failing to provide the required notice of its claim and was prejudiced by the unreasonable delay in providing notice to Travelers; (2) CDF is not entitled to recover pre-tender costs (i.e., payments CDF made or obligations it assumed prior to tendering the claim to Travelers); (3) CDF cannot demonstrate the existence of an accident or "occurrence" as that term would be defined by any applicable policies; (4) CDF cannot demonstrate the existence of

any "property damage" as that term would be used or defined by any applicable policies; (5) even assuming arguendo that CDF could prove an "occurrence" or "property damage" as defined in the policies, coverage would be precluded by two exclusions: (a) the owned property exclusion; and (b) for policies from 1970 forward, the pollution exclusion; and (6) CDF's claims are barred by the doctrine of laches.  Doc. 54-1, pp. 9-10, 21-48; Doc. 62, pp. 4-16.

## V.  Summary Judgment Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  The movant "bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323 (1986) (internal quotations omitted).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986).  "Inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Id.* at 587 (internal quotations and citations omitted).  However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  The non-moving party must present specific facts that demonstrate there is a genuine issue of material fact for trial.  *Matsushita,* 475 U.S. at 587.

"The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A genuine issue for trial exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Muncie Power Products, Inc. v. United Technologies Automotive, Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248). Thus, for a plaintiff to avoid summary judgment against him, "there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* at 252. Accordingly, in determining whether summary judgment is warranted, a judge generally asks "whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Id.* (emphasis in original) (internal citations omitted).

## VI.     Analysis

The Court's jurisdiction in this case is based on diversity of citizenship and, therefore, Ohio law governs. *See Equitable Life Assur. Soc. of U.S. v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998) ("Pursuant to the well-known doctrine of *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal judge sitting in a diversity action must apply the same substantive law that would be applied if the action had been brought in a state court of the jurisdiction in which the federal court is located.").

The Supreme Court of Ohio has stated the following with respect to insurance policies and contract interpretation in Ohio

> An insurance policy is a contract whose interpretation is a matter of
> law. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d

17

403, 374 N.E.2d 146, paragraph one of the syllabus. Contract terms are to be given their plain and ordinary meaning. *Gomolka v. State Auto. Mut. Ins. Co.* (1982), 70 Ohio St.2d 166, 167–168, 24 O.O.3d 274, 436 N.E.2d 1347. If provisions are susceptible of more than one interpretation, they "will be construed strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.* (1988), 35 Ohio St.3d 208, 519 N.E.2d 1380, syllabus. Additionally, "an exclusion in an insurance policy will be interpreted as applying only to that which is *clearly* intended to be excluded." (Emphasis sic.) *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096.

*Sharonville v. Am. Employers Ins. Co.*, 109 Ohio St.3d 186, 187 (2006) (citation omitted).

Travelers argues that CDF failed to satisfy conditions precedent to insurance coverage under both primary and umbrella policies.  Travelers asserts that it is not liable under primary or umbrella policies for alleged losses incurred by CDF in connection with the Pond Closure Claim because CDF failed to provide notice to Travelers of the Pond Closure Claims as required by the terms of the policies.  Travelers also asserts that CDF had a duty to refrain from voluntarily making any payments or assuming obligations except at its own cost.

**A.  Notice provisions**

As the parties have stipulated, "To the extent that CDF is able to establish the existence and terms of primary or excess policies issued by Aetna for which coverage exists, those policies would contain the following relevant language [regarding notice]:"

Notice

The Umbrella Policies would contain language such as:

Notice of Occurrence: Upon the happening of any occurrence reasonably likely to involve any of the coverages of this policy, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable. Policies, at 6.3(a)

The Primary Policies would contain similar notice provisions, such as the following:

> Upon the occurrence of an accident written notice shall be given by or on behalf of the insured to the company or any of its authorized agents <u>as soon as practicable</u>. ("Exemplar Policies" "effective" from 1945-1948) (Talley Report Tab 23)
>
> In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses shall be given by or forth the insured to the company or any of its authorized agents <u>as soon as practicable</u>.
>
> If claim is made or suit is brought against the insured, the insured <u>shall immediately</u> forward to the company every demand, notice, summons or other process received by him or his representative.

Doc. 55, p. 7 (emphasis supplied).

"Notice provisions in insurance contracts are conditions precedent to coverage, so an insured's failure to give its insurer notice in a timely fashion bars coverage." *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St. 3d 512, 517 (2002).   When there is an alleged breach of a policy condition requiring prompt notice, courts look first at whether the insured breached the policy condition and, then, if there is a breach, courts look at whether the insurer was prejudiced by the breach.  *Ferrando v. Auto-Owners Mut. Ins. Co.*, 98 Ohio St.3d 186, 208 (2002).

"A provision in an insurance policy requiring notice to the insurer 'as soon as practicable' requires notice within a reasonable time in light of all the surrounding facts and circumstances." *Goodyear Tire & Rubber Co.*, 95 Ohio St. 3d at 517 (quoting *Ormet Primary Aluminum Corp. v. Employers Ins. of Wausau*, 88 Ohio St.3d 292, 725 N.E.2d 646, syllabus (2000); *see also Ferrando*, 98 Ohio St.3d at 208 (indicating that, when determining whether an insured's notice was timely, the question asked is whether the insurer "received notice 'within a reasonable time in light of all the surrounding facts and circumstances[]'") (internal citations

omitted).  And, "[a] similar requirement is applied to a provision that compels notice

'immediately.'").  *Goodyear*, 95 Ohio St.3d at 517 (citing *Ormet*, 88 Ohio St.3d at 303).  As

explained in *Ormet*,

> Notice provisions in insurance contracts serve many purposes. Notice provisions
> allow the insurer to become aware of occurrences early enough that it can have a
> meaningful opportunity to investigate.  In addition, it provides the insurer the
> ability to determine whether the allegations state a claim that is covered by the
> policy. It allows the insurer to step in and control the potential litigation, protect
> its own interests, maintain the proper reserves in its accounts, and pursue possible
> subrogation claims. Further, it allows insurers to make timely investigations of
> occurrences in order to evaluate claims and to defend against fraudulent, invalid,
> or excessive claims.

88 Ohio St.3d at 302-303 (internal citations omitted); *see also Hamilton Mut. Ins. Co. v. Perry*,

1993 Ohio App. LEXIS 1167, * 13 (Ohio App. Ct. Feb. 26, 1993) ("The purpose behind the

notice requirement in insurance contracts is to provide the insurer with an opportunity to

investigate a claim, to negotiate a settlement and to participate in the defense of its insured.").

　　　　"Unreasonable notice gives rise to a presumption of prejudice to the insurer, which the

insured bears the burden of presenting evidence to rebut."  *Ferrando*, 98 Ohio St.3d at 208*.

"Generally, the question of timeliness calls into play matters to be discerned by the finder of

fact; however, it is also true that 'an unexcused significant delay may be unreasonable as a

matter of law.'" *Id.* (quoting *Ormet*, 88 Ohio St.3d at 300).

### *Primary policies*

### *Whether there was a breach*

　　　　As indicated above, with respect to the primary policies, the policy language required

that notice be provided "as soon as practicable" and/or "immediately."  Doc. 55, p. 7.  Thus,

when considering the first inquiry, i.e., whether there was a breach of a policy condition, the

question is whether CDF provided notice to Travelers within a reasonable time in light of all the surrounding facts and circumstances.

CDF recognizes that the issue of timeliness of notice can be determined as a matter of law if the facts are undisputed.  Doc. 60, p. 25.  The undisputed facts are that CDF first provided notice to Travelers regarding its claim for insurance coverage for the Pond Closure Claim on November 30, 2016.  Doc. 45, p. 218:3-7 (Deposition of Bradley Ahbe, President of CDF ("Ahbe")); Doc. 55, p. 5, ¶ 35; Doc. 55-34; Doc. 60-1, p. 4, ¶ 18.  Yet, beginning in 1993, if not earlier, CDF was aware of an issue with one or more of the ponds and started to contemplate closure or remediation of the ponds.  *See* Doc. 55, p. 2, ¶ 8; Doc. 55-9 (CDF March 31, 1993, Audit Action Plan, noting, under the section entitled "New Pretreatment System and Lagoon Remediation" – "Phase B* - Remediation of lagoons 1 and 2" that "Task I" was "Remove and properly dispose of oil emulsions[.]"); *see also* Doc. 45, p. 51:13-19 (in 1993, CDF started to consider closing or remediating Pond 1).

Furthermore, the stipulated facts demonstrate that CDF did not provide notice to Travelers of the Pond Closure Claim until *after*, among other events:

- Pond 1 was drained in 1995 and the bottom material was excavated for bioremediation;

- CDF installed an OWS in 1995 that did not work properly and process water containing oil continued to be discharged into the ponds until around 2016;

- CDF engaged Parsons Engineering Science in 1997 to perform work relative to the ponds and an internal CDF memo dated November 24, 1997, stated that "According to Parsons, current EPA regulations require us to stop the discharge

of oil bearing waste streams to lagoons, but do not require remediation of oil impacted soil on the bottom or around the lagoon banks.";

- US EPA performed a site screening in July 2011 pursuant to RCRA;

- CDF retained TRC, an environmental consultant, in the spring and summer of 2012 to evaluate the Site for possible participation in the Ohio VAP program;

- US EPA inspected the Site in August 2012 and issued a report of its inspection in September 2012;

- CDF, through TRC, in September 2012 submitted Notice of Entry in the RCRA and Ohio VAP Memorandum of Agreement Track program;

- TRC performed required Phase I and II site assessments as part of the VAP in September and October of 2012;

- US EPA issued a NOV under RCRA to CDF on January 22, 2013;

- OEPA, in March 2013, informed CDF it was not eligible to participate in the VAP due to the pending US EPA NOV;

- CDF, with the assistance of environmental consultants and attorneys, from January 2013 through 2014 negotiated with US EPA and OEPA to resolve the NOV and potential liability;

- OEPA issued the DFFO in September 2014, in connection with the NOV; US EPA in September 2014, issued the CAFO in resolution of the NOV;

- In June 2016, CDF submitted a closure certificate to OEPA for the Ponds; and

- In August 2016, OEPA issued a "Final Closure" letter to CDF.

Doc. 55, pp. 2-5, ¶¶ 8-9, 11-15, 19, 20-32, 35.

Under the notice provisions of the primary policies, CDF was required to immediately forward to Travelers every "demand, notice, summons or other process received[]" when a claim was made or suit was filed.  Doc. 55, p. 7.  A provision in an insurance policy requiring "'immediate' notice means that the notice must take place 'within a reasonable time under the circumstances of the case.'"  *Ormet*, 88 Ohio St.3d at 303.  CDF's notice to Travelers was not immediate nor was it provided within a reasonable time under the circumstances.  It is undisputed that CDF did not provide notice to Travelers until November 30, 2016, almost 4 years after US EPA issued the NOV.  Although there is no specific period of delay that will be held to be unreasonable, the Court finds as a matter of law that, in these circumstances, CDF's notice to Travelers was unreasonable and CDF breached the policy provision requiring immediate notification when a claim or suit is made against the insured.

Additionally, under the primary policies, CDF was also required to provide notice of an occurrence as soon as practicable.  Doc. 55, p. 7.  As discussed above, "[a] provision in an insurance policy requiring notice to the insurer 'as soon as practicable' requires notice within a reasonable time in light of all the surrounding facts and circumstances."  *Goodyear*, 95 Ohio St.3d at 517.  The undisputed facts establish that, even prior to the NOV, there was a history of oil accumulation within or near the ponds that CDF was aware of and that CDF pursued various efforts to remediate without ever notifying Travelers until years after receiving the US EPA's NOV.  In light of the surrounding facts and circumstances, the Court finds as a matter of law that CDF's notice to Travelers of an occurrence was unreasonable and CDF breached the policy provision requiring notice of an occurrence as soon practicable.

In an attempt to argue that its November 30, 2016, notice to Travelers was reasonable in light of the circumstances, CDF asserts that it acted immediately in 2012 to avoid a federal

enforcement action and challenged the NOV before working with regulators to resolve the claim. Doc. 60, p. 26. Even if CDF acted immediately in 2012 to avoid the federal NOV or challenged the NOV prior to reaching a settlement with the regulators, those actions do not demonstrate that its decision to wait until November 30, 2016, to first notify its insurer of the claim made by the US EPA against it in 2013 was provided within a reasonable time.

CDF also asserts that it provided notice to Travelers of the claim "as soon as secondary evidence of coverage under the appropriate policies was discovered in late 2016[]" and contends, that, as in *Pennsylvania. Gen. Ins. Co. v. Park-Ohio Indus.*, 126 Ohio St. 3d 98 (2010), its belated knowledge of the existence of the policies should justify its delay in notice to Travelers. Doc. 60, pp. 25-26.

The evidence does not support CDF's claim that it was unaware of the existence of possible insurance coverage for environmental claims until 2016. For example, in 1988, CDF, through counsel, "provided notice of potential liability from USEPA in connection with Summit National Facility in Deerfield, Ohio (the '1988 Summit National Claim') to its insurers, including Aetna Casualty and Surety Company ('Aetna')." Doc. 55, p. 8, ¶ 45. The policy numbers listed in CDF's notice regarding the 1998 Summit National Claim – 02 GL 54294 CCA and 02 XS 4811 WCA – are two of the polices under which CDF seeks coverage in this case. Doc. 55-44, Doc. 1, p. 6, ¶ 31(k) and (l). When denying coverage of that claim for various reasons, in a letter dated November 16, 1994, Aetna relayed that its investigation into the matter revealed that Aetna had issued eight Commercial Liability policies to Canton Drop Forge and Manufacturing. Doc. 55, p. 9, ¶ 5; Doc. 55-50. Additionally, Ahbe, President of CDF since 2004 (Doc. 45, p. 7:4-7),[15] testified during his deposition that, "in 1993 or 1994, Canton

---

[15] Ahbe started working at CDF in 1987 or 1988. Doc. 45, p. 13:20-21.

Drop Forge was aware that it had Aetna policies that might respond to an environmental claim[]."  Doc. 45, p. 166:17-20; *see also* Doc. 45, p. 167:7-9.

Furthermore, CDF's reliance on *Park-Ohio* to justify its delay in providing notice to Travelers is misplaced.  *Park-Ohio* involved a claim by an insurer (Penn General) against its insured's other insurers for equitable contribution.  *Park-Ohio*, 126 Ohio St. 3d at 99.  The court explained that, in *Goodyear*, 95 Ohio St.3d 512, the court

> adopted the all-sums approach and held that "when a continuous occurrence of environmental pollution triggers claims under multiple primary insurance policies, the insured is entitled to secure coverage from a single policy of its  choice that covers 'all sums' incurred as damages 'during the policy period,' subject to that policy's limit of coverage." Id. at ¶ 11. In such an instance, any targeted insurer bears the burden of obtaining contribution from other applicable primary insurance policies as it deems necessary. Id.

*Id.* at 102 (citing and quoting *Goodyear*, 95 Ohio St.3d 512).  The non-targeted insurers argued that Park-Ohio (the insured) had not timely notified them of the underlying litigation and therefore violated the terms of their insurance policies such that Penn General (the targeted insurer) should not be entitled to seek contribution from them.  *Id*.  Recognizing the "unique situation surrounding the allocation of liability in progressive-injury cases," the court found that the notice was not unreasonable, explaining:

> Unlike the insured in *Ormet,* which failed to notify any insurer until five years after signing the settlement agreement,  Park–Ohio placed Penn General on notice while the DiStefano litigation was still pending. In accordance with *Goodyear,* Park–Ohio selected Penn General as the targeted insurer, and Penn General provided notification of the claim to appellants approximately two months after being notified of appellants' policies. Because *Goodyear* created an equitable approach to the unique situation surrounding the allocation of liability in progressive-injury cases, Park–Ohio's notice to appellants can be seen as being "within a reasonable time in light of all the surrounding facts and circumstances" under *Ormet*.

*Park-Ohio*, 126 Ohio St.3d at 103-104.

The facts in this case are readily distinguishable from those in *Park-Ohio*. Accordingly, CDF's reliance on it to justify its delayed notice to Travelers is ineffective.

For the reasons set forth herein, after evaluating the evidence in the light most favorable to CDF, the Court concludes that CDF's notice to Travelers under the notice provisions of the primary policies was not reasonable in light of the surrounding circumstances. *See e.g., Ormet*, 88 Ohio St.3d at 302 (finding notice to insurers was unreasonable as a matter of law).

<u>*Whether Travelers was prejudiced by the breach*</u>

Having concluded that CDF breached the notice condition in the primary policies, the next inquiry is whether Travelers was prejudiced by the breach. *Ferrando*, 98 Ohio St.3d at 208. Where, as in this case, there is an unreasonable notice, "there is a presumption of prejudice to the insurer, which the insured bears the burden of presenting evidence to rebut." *Ferrando*, 98 Ohio St.3d at 208. Thus, CDF has the burden of rebutting the presumption that Travelers was prejudiced by the unreasonable delay in providing notice.

In *Ormet*, the Supreme Court of Ohio concluded that it was not necessary to inquire into whether the insured "presented proof to rebut the presumption of prejudice because reasonable minds could only conclude that the [insurers] suffered actual prejudice from the delay." 88 Ohio St.3d at 303. CDF contends that the facts of *Ormet* are distinguishable and, therefore, the Court should not find actual prejudice as a result of CDF's unreasonable delay in providing notice to Travelers. Doc. 60, pp. 31-33. CDF contends that this case is more like *Hamilton*, 1993 Ohio App. LEXIS 1167 (an insurance coverage case involving an underlying personal injury negligence claim) than *Ormet* because:

> All material CDF witnesses were available, the condition of the Site over time
> was documented with maps, aerial and other photographs, consultant reports,
> internal communications, formal and informal updates to OEPA and USEPA,
> laboratory results of hundreds of samples, OEPA and USEPA file information,

> engineering analysis, plus contract proposals and invoices. There is not a shred of
> evidence missing that prevents a complete and thorough investigation. The
> discovery in this case included tens of thousands of pages of documents and
> several CDF and TRC witnesses were deposed at length. Travelers' three experts
> were able to prepare extensive reports totaling 198 pages and countless opinions.

Doc. 60, p. 31.  CDF also argues that the evidence shows that CDF acted reasonably in response

to the NOV and was represented by experienced legal counsel and environmental consultants

when responding to the NOV.  Doc. 60, p. 32.  CDF argues that the resolution CDF negotiated

with the US EPA "was reasonable" and "likely saved thousands of dollars in additional

sampling and excavation."  Doc. 60, p. 32.  CDF asserts that, with respect to groundwater and

contaminated soil, through the agreements entered into with the US EPA and Ohio EPA, the US

EPA agreed to allow CDF to follow the Ohio VAP MOA procedures rather than the more

rigorous compliance procedures required under RCRA. Doc. 60, pp. 13, 32.  Further, CDF

argues that the evidence establishes that Travelers would not have taken any action to get

involved in the environmental claim at any time; CDF is not seeking recovery of defense and

investigation costs and, since CDF did not waive any subrogation rights under the DFFO or

CAFO, Travelers' rights were not impacted as a result of the issuance of those orders.  Doc. 60,

pp. 31-33.

In *Ormet,* the Ohio Supreme Court considered a number of factors, including the

unavailability of witnesses and documents or other evidence being lost or destroyed and

changes in the conditions of the site, when concluding that the insured's unreasonable delay in

notice caused actual prejudice to the insurers.  However, the court stressed that "[t]he most

glaring example of this type of prejudice is that Ormet unilaterally entered into a thirty-eight-

page settlement agreement, in the form of an Administrative Order by Consent, with the

USEPA and the Ohio EPA without notifying or obtaining the consent of its insurers." *Ormet*, 88

Ohio St.3d at 304 (emphasis supplied); *see also Hamilton*, 1993 Ohio App. LEXIS 1167, * 13
(explaining that, "[t]he purpose behind the notice requirement in insurance contracts is to
provide the insurer with an opportunity to investigate a claim, to negotiate a settlement and to
participate in the defense of its insured[]") (emphasis supplied); *see also Sesko v. Caw*, 2006
WL 2976458, * 4 (Ohio App. Ct. 2006) (concluding that there was "no doubt that [the
insured's] failure to give timely notice" of the claim, prejudiced the insurer because, by the time
the insurer learned of the action, "default judgment had been entered [and] [t]he time to appeal
had passed[.]").

In this case, similar to *Ormet*, CDF negotiated with and entered into a CAFO with the
US EPA as a resolution of the NOV without notice to or consent from Travelers.  Doc. 55, pp.
4-5, ¶¶ 30, 35.  Additionally, the DFFO was entered with CDF agreeing to its terms (Doc. 55-
29) and CDF submitted a Notice of Entry in the RCRA and Ohio VAP MOA Track program
without notice to or consent from Travelers (Doc. 55, pp. 4-5, ¶¶ 23, 35).  In contrast, the
insured in *Hamilton* did not settle a claim without notifying his insurer.  Although the insured in
that case did not timely notify his insurer of the accident, once a lawsuit was filed, albeit 13
years later,[16] the insured immediately notified his homeowner's insurer of the lawsuit.
*Hamilton Mut. Ins. Co.*, 1993 Ohio App. LEXIS 1167, * 2-3.

Also, the insured in *Ormet*, as CDF does here, argued that prejudice should not be found
because it handled the claim reasonably, i.e., in an efficient and cost-effective manner.  *Ormet*,
88 Ohio St.3d at 305.  The court, however, found those arguments speculative at best.  *Id.*

---

[16] The claim in *Hamilton* involved a suit by an insured's son against the insured after a fireplace mantle that the
insured had helped design and install had fallen on the son.  *Hamilton*, 1993 Ohio App. LEXIS 1167, * 2-3.  At the
time of the accident, i.e., 1973, the doctrine of parental immunity precluded a suit by the insured's son against the
insured.  *Id.*  However, the doctrine of parental immunity was abolished in 1984.  *Id.*  Subsequently, in 1990, the
insured's son filed suit against the insured for negligence and the insured immediately notified his insurer.  *Id.*

Additionally, the court found the insured's argument that, even if it had notified its insurers in a timely manner, they would have denied the claim to be "purely conjecture."  *Id.*   As the court did in *Ormet*, this Court finds CDF's argument that there was no prejudice to Travelers from its decision to settle its environmental claims – for which it seeks damages in the amount of approximately $8.1 million (Doc. 55, p. 5, ¶ 38) – unavailing.  By not providing notice until *after* agreeing to the OEPA DFFO, *after* agreeing to enter into a CAFO to resolve the NOV, and *after* receiving a "Final Closure" letter from the OEPA, CDF left Travelers with no opportunity to be involved in defending or negotiating a resolution to the environmental claim.  For these reasons, the Court finds that reasonable minds could not differ as to the fact that CDF "failed to give timely notice to [Travelers] causing [Travelers] to suffer actual prejudice[]" with respect to the primary policies of insurance.  *Ormet*, 88 Ohio St.3d at 305.  Accordingly, the Court finds that Travelers is entitled to summary judgment as to the claims asserted with respect to the primary policies of insurance.

### *Umbrella policies*

As set forth above, the parties have stipulated that the notice provision under the umbrella policies would contain language stating that, "Upon the happening of any occurrence reasonably likely to involve any of the coverages of this policy, written notice . . . shall be given by or for the insured to the company or any of its authorized agents as soon as practicable." Doc 55, p. 7.

CDF argues that, even if it did not provide appropriate notice under the primary policies, its notice under the excess policies was appropriate.  Doc. 60, p. 34, n. 4.  Travelers maintains that CDF provided improper notice under both the primary and excess policies and that it has

demonstrated that there is no coverage under both the primary and excess policy terms.  Doc. 62, p. 16.

In advancing its argument, CDF asserts that "for a loss, such as the damages that CDF incurred in connection with the underlying Pond Closure Claim, which exceeds the retained limits, the excess policy can be triggered regardless of payment by the primary insurer under the primary policy."  Doc. 60, p. 34 (relying on *Magnetek, Inc. v. The Travelers Indemnity Co.*, N.D.Ill. Case No. 17 C 3173 (July 11, 2019), *citing Elliott Co. v. Liberty Mut. Ins. Co.*, 434 F.Supp.2d 483, 499 (N.D. Ohio 2006)).[17]  Furthermore, CDF contends that, "[u]nder the excess policy language [its] duty to provide notice is not triggered until it is clear that liability will exhaust its coverage under its primary policies[]"  and "CDF did not know that Travelers would deny coverage under all thirty-six years of available primary coverage until after filing this lawsuit[]; therefore, CDF did not know the Pond Closure Claim would involve excess umbrella coverage until after it had already provided notice."  Doc. 60, p. 34, n. 4 (citing *B.F. Goodrich Co. v. Commercial Union Ins.*, Summit Co. No. 20936, 2002-Ohio-5033, 10, 2002 Ohio App. LEXIS 5081 (9th Dist.) for the proposition "[The insured] must have knowledge not only of potential liability but it must also have reason to believe that the extent of its liability will exceed the coverage limits of its primary insurance policy.").

CDF's claim that it did not breach the excess policy notice condition because it did not know the claim would involve excess coverage until the lawsuit was filed does not square with its  other contention, i.e., that "an excess policy can be triggered regardless of payment by the primary insurer under the primary policy."  Doc. 60, p. 23; Doc. 60, p. 34

---

[17] The issue in *Magnetek, Inc.* and *Elliott Co.* was different than the issue in this case.  The issue in those cases was whether an insured and insurer could, by settlement or agreement, agree that a primary policy was exhausted resulting in the excess policies being triggered.

Even if CDF has sufficiently demonstrated that there is a genuine issue of material fact as to whether notice under the umbrella policies was reasonable, as discussed below, the Court finds that Travelers is entitled to summary judgment based on CDF's failure to obtain Travelers' consent prior to obligating itself under agreements with the US EPA and Ohio EPA.

### B.  Pre-tender costs

Travelers contends that, under the terms of the policies, Travelers "has no duty [under the primary or excess policies] to pay for any costs that CDF incurred or assumed as an obligation prior to tendering its claim to Travelers."  Doc. 54-1, pp. 30-31.

With respect to the umbrella policies,[18] Travelers argues that it is not obligated to pay for or indemnify CDF for the costs associated with the Pond Closure Claim because CDF settled the claim without the consent of Travelers.  Doc. 54-1, pp. 30-31.  Travelers relies on the following provision which CDF has agreed would be contained in the umbrella policies:

> Travelers agrees to "indemnify the insured for ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages because of…property damage…to which this policy applies…" Policies, at 2.1.

> "Ultimate net loss" is defined as, "[T]he sum actually paid or payable in cash in the settlement or satisfaction of any claim or suit for which the insured is liable either by adjudication or settlement <u>with the written consent of the company</u>, after making proper deduction for all recoveries and salvages collectible."

---

[18] With respect to the primary policies, Travelers argues that it is not obligated to provide coverage because, contrary to the terms of those polices, CDF voluntarily made payments and assumed obligations.  Doc. 54-1, p. 31. In support of this argument, Travelers relies on the following language in the primary policies:

> The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the accident.

Doc. 55, p. 8, ¶39.  CDF argues that its "expenditures in connection with the Pond Closure Claim were anything but 'voluntary.'"  Doc. 60, p. 28.  In light of the Court's conclusion that Travelers is entitled to summary judgment as to the claims asserted with respect to the primary policies based on CDF's unreasonable notice to Travelers, the Court declines to consider Travelers' argument premised on a breach of the "voluntary payment" provision.

Doc. 55, p. 6 (emphasis supplied).  CDF obligated itself to remedy and therefore pay for costs associated with Pond Closure Claim through settlement and agreements with the US EPA and Ohio EPA.  Doc. 55-29, Doc. 55-30.  It is undisputed that Travelers did not consent to either the CAFO or DFFO.  Nor did Travelers have the opportunity to do so since CDF did not notify Travelers until after the agreements were finalized.

Plaintiff and Defendant disagree as to whether Travelers must demonstrate prejudice to succeed on this argument.  Assuming arguendo that Plaintiff is correct in its position that Travelers can only prevail if CDF's breach of the policy condition actually prejudiced Travelers, for the reasons discussed above in connection with analysis regarding the notice provisions, the Court finds that CDF's unilateral decision to enter into agreements with the US EPA and Ohio EPA to settle the Pond Closure Claim, without timely notifying or obtaining Traveler's consent prejudiced to Travelers.

While CDF contends that "[t]here is not a shred of evidence missing that prevents a complete and thorough investigation" (Doc. 60, p. 31), CDF has not shown that an investigation *after* CDF entered into the agreements with the US EPA and Ohio EPA negates prejudice to Travelers.  Even if Travelers can still conduct an investigation, no matter how complete or thorough, Travelers cannot now undo or challenge the CAFO, DFFO, or CDF's entry into the VAP MOA Track.  As discussed above, when finding actual prejudice resulting from an insured's breach of a policy condition, the Ohio Supreme Court explained that, "The most glaring example of this type of prejudice is that Ormet unilaterally entered into a thirty-eight-page settlement agreement, in the form of an Administrative Order by Consent, with the USEPA and the Ohio EPA without notifying or obtaining the consent of its insurers." *Ormet*, 88 Ohio St.3d at 304 (emphasis supplied); *see also Sesko*, 2006 WL 2976458, * 4 (concluding that

there was "no doubt that [the insured's] failure to give timely notice" of the claim, prejudiced the insurer because, by the time the insurer learned of the action, "default judgment had been entered [and] [t]he time to appeal had passed[.]").  CDF also contends that there was no prejudice to Travelers because the agreement it reached with US EPA was "reasonable, if not favorable to CDF[,]" and because "Travelers would *not* have taken any action to get involved in a CDF environmental claim at any time." Doc. 60, p. 32 (emphasis in original).  As explained above, similar arguments were advanced and rejected by the Supreme Court of Ohio in *Ormet* and this Court also finds them unavailing.

For the reasons explained herein, the Court finds that Travelers is entitled to summary judgment as to CDF's claims under the umbrella policies of insurance because, contrary to the terms of those policies and to the prejudice of Travelers, CDF settled the claim without Travelers' consent.

### C.  Alternative arguments

As explained above, Travelers also argues that summary judgment is warranted on other grounds.  However, since the Court finds that Travelers is entitled to summary judgment as a matter of law as set forth herein, the Court declines to address Travelers' alternative arguments.

### VII.    Conclusion

For the reasons explained herein, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 54, Doc. 54-1) and dismisses with prejudice Plaintiff's claims against Defendant.

Dated: March 11, 2021

*/s/ Kathleen B. Burke*
KATHLEEN B. BURKE
United States Magistrate Judge